**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**MARK CELESTINO LUCERO,**

      **Plaintiff,**

    **vs.**                                    **Civ. No. 20-518 KK**

**ANDREW M. SAUL,
Commissioner of Social Security
Administration,**

      **Defendant.**

## <u>MEMORANDUM OPINION AND ORDER</u>[1]

THIS MATTER is before the Court on Plaintiff Mark Celestino Lucero's Complaint (Doc. 1) seeking review of the decision of Defendant Andrew M. Saul, Commissioner of the Social Security Administration ("Commissioner") denying Mr. Lucero's claims for Disability Insurance Benefits ("DIB") under Title II and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-434 and 1381-1383f. (AR 20-29.)[2] On February 2, 2021, Mr. Lucero filed his Motion to Reverse and Remand for a Rehearing with Supportive Memorandum ("Motion"). (Doc. 22.) The Commissioner filed a response in opposition on March 29, 2021, (Doc. 24), and Mr. Lucero filed a reply in support on April 13, 2021 (Doc. 25). The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c). Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is well taken and should be GRANTED.

### I.  <u>Legal Standards</u>

---

[1] Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Docs. 3, 5.)

[2] Citations to "AR" are to the Certified Transcript of the Administrative Record filed in this matter on October 27, 2020. (Doc. 15.)

**A.     Standard of Review**

This Court must affirm the Commissioner's final decision denying social security benefits unless:  (1) "substantial evidence" does not support the decision; or, (2) the Administrative Law Judge ("ALJ") did not apply the correct legal standards in reaching the decision. 42 U.S.C. §§ 405(g), 1383(c)(3); *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). The Court must meticulously review the entire record but may "neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008); *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* Although the Court may not reweigh the evidence or try the issues *de novo*, its consideration of the record must include "anything that may undercut or detract from the [agency]'s findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] agency's findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

The ALJ's decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Thus, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the ALJ . . . must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence

he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). If the ALJ fails to do so, "the case must be remanded for the ALJ to set out his specific findings and his reasons for accepting or rejecting evidence[.]" *Id.* at 1010.

## B. Disability Determination Process

A person must, *inter alia*, be "under a disability" to qualify for DIB; similarly, a "disabled" person may qualify for SSI. 42 U.S.C. §§ 423(a)(1)(E), 1382(a)(1). An individual is disabled if he or she is unable

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A). To determine whether a person meets this definition, the Commissioner has adopted a five-step sequential analysis:

(1)     At step one, the ALJ must determine whether the claimant is engaging in "substantial gainful activity." If the claimant is engaging in substantial gainful activity, he or she is not disabled regardless of his or her medical condition.

(2)     At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment (or combination of impairments) that is severe and meets the duration requirement, he or she is not disabled.

(3)     At step three, the ALJ must determine whether a claimant's impairment meets or equals in severity one of the listings described in Appendix 1 of 20 C.F.R. Part 404, Subpart P, and meets the duration requirement. If so, a claimant is presumed disabled.

(4)     If none of the claimant's impairments meet or equal one of the listings, the ALJ must determine at step four whether the claimant can perform his or her "past relevant work." This step involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ must consider all the relevant evidence and determine what is "the most [the claimant] can still do despite [his or her physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* Second, the ALJ must determine the

physical and mental demands of the claimant's past work. Third, the ALJ must determine whether, given the claimant's RFC, the claimant is capable of meeting those demands. A claimant who can perform his or her past relevant work is not disabled.

(5)     If the claimant is unable to perform his or her past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner can make the required showing, the claimant is deemed not disabled.

20 C.F.R. § 404.1520(a)(4) (DIB); 20 C.F.R. § 416.920(a)(4) (SSI); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan*, 399 F.3d at 1261. The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step evaluation process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

## II.  Background and Procedural History

### A.     Factual Background

Mr. Lucero alleges that he became disabled on January 1, 2010, at the age of thirty-seven, due to bipolar disorder and manic depression. (AR 308, 312.) Mr. Lucero completed the twelfth grade and previously operated a farming business and worked as a salesperson and general manager for truck parts retailers. (AR 46, 54, 313.) Mr. Lucero alleges that his mental health disorders kept him from functioning at his former employment and prevent him from returning to work due to problems interacting with others, physical and emotional fatigue, sleep disturbances, medication side effects, and inability to focus. (AR 49-61.)

**B.** **Procedural History**

Mr. Lucero applied for DIB and SSI on November 15, 2016, alleging a disability onset date of January 1, 2010. (AR 20, 81, 108-09.) His date last insured was December 31, 2011. (AR 81.) Disability Determination Services found that Mr. Lucero was not disabled both initially and on reconsideration. (AR 81-92, 93-107, 110-19, 120-29.) Mr. Lucero requested a hearing before an Administrative Law Judge ("ALJ") on the merits of his application. (AR 148-49.)

ALJ Jeffrey N. Holappa conducted a hearing in Albuquerque on March 29, 2019. (AR 35-78.) Mr. Lucero appeared in person at the hearing with his attorney, Michelle Baca.[3] (AR 36.) The ALJ took testimony from Mr. Lucero and an impartial vocational expert ("VE"), Phunda Yarbrough. (AR 42-76.) On May 15, 2019, the ALJ issued an unfavorable decision. (AR 17-29.) The Appeals Council denied Mr. Lucero's request for review and upheld the ALJ's decision on April 1, 2020, making the ALJ's decision the Commissioner's final decision from which Mr. Lucero now appeals. (AR 1-3; Doc. 1.)

**C.** **The ALJ's Decision**

At step one of the sequential evaluation process, the ALJ determined that Mr. Lucero had not engaged in substantial gainful activity since his alleged onset date. (AR 22.) The ALJ found at step two that Mr. Lucero has the severe impairments of: "right acromioclavicular joint separation; bipolar disorder; depression; and posttraumatic stress disorder[.]" (*Id.*) At step three, the ALJ determined that Mr. Lucero's impairments do not meet or medically equal the severity of one of the listings described in Appendix 1 of 20 C.F.R. Part 404, Subpart P. (AR 23.) In making this determination, the ALJ concluded that Mr. Lucero has moderate limitations in his abilities to

---

[3] Plaintiff is represented in this proceeding by attorney Laura Joellen Johnson. (AR 7-10.)

understand, remember, or apply information, to interact with others, to concentrate, persist, or maintain pace, and to adapt or manage himself. (AR 23-24.)

At step four, the ALJ found that Mr. Lucero has the RFC

> to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except he can only frequently reach overhead with his right upper extremity and can only frequently climb ladders, ropes, and scaffolds. Mentally, the claimant is limited to performing simple, routine, repetitive tasks, making simple work[-]related decisions, maintaining concentration, persistence and pace for two-hour intervals, and interacting occasionally with supervisors, coworkers, and the general public.

(AR 24.) In explaining his RFC determination, the ALJ gave the opinions of State agency non-examining consultant W. Miller Logan, M.D, "partial weight, to the extent consistent with the record as a whole." (AR 27.) The ALJ also noted and gave "partial weight to the opinion of [Mr. Lucero]'s mother." (*Id.*)

Also at step four, the ALJ found that Mr. Lucero is unable to perform his past work as a retail sales manager or parts salesperson. (AR 27.) Thus, the ALJ proceeded to step five, at which he found that "there are jobs that exist in significant numbers in the national economy that the claimant can perform[.]" (*Id.*) The ALJ relied on the VE's testimony that an individual with Mr. Lucero's age, education, work experience, and RFC, as determined by the ALJ, could perform the requirements of "unskilled medium[-]exertion occupations" such as meat clerk, floor waxer, and dry janitor. (AR 28.) The ALJ therefore concluded that Mr. Lucero is not disabled. (AR 29.)

### III. Analysis

Mr. Lucero argues that the ALJ impermissibly rejected Dr. Logan's opinions regarding Mr. Lucero's mental impairments without explanation. (Doc. 22 at 10-19.) In particular, Mr. Lucero argues that the ALJ improperly failed to explain his effective rejection of Dr. Logan's opinions regarding Mr. Lucero's abilities to maintain concentration, persistence, and pace and to interact appropriately with others. The Commissioner responds that the ALJ was not required to "parrot"

Dr. Logan's opinions where he only gave them partial weight, and argues that "the ALJ's RFC finding reasonably accounts for Dr. [Logan]'s opinion[s] in light of all of the other relevant evidence found in the record." (Doc. 24 at 5-7 (emphasis omitted).) As explained below, the Court agrees with Mr. Lucero.

### A. Mental Health History[4]

1.  <u>Mr. Lucero's Work History</u>

Mr. Lucero is a high-school graduate. (AR 44.) From 2002 to 2004, Mr. Lucero worked at Trucks Unique, a truck parts store, as a general manager. (AR 47, 225.) In 2005, Mr. Lucero worked at Accessories Unlimited, another truck parts store. (AR 45-46, 225.) From around 2006 to 2009, he did farm work with M&L Farms. (AR 45, 225-26.) And, in 2009, Mr. Lucero worked at Lucero Custom Truck, a truck parts business he started, until the business failed. (AR 45.) He has not worked since 2009. (AR 45, 226.)

2.  <u>Mr. Lucero's Hearing Testimony</u>

At his March 29, 2019 hearing before the ALJ, Mr. Lucero testified as follows. When Mr. Lucero was employed by Trucks Unique and following a divorce, he began to struggle with anger and depression that prevented him from functioning at his job. (AR 49.) Trucks Unique fired him, and he struggled with the same issues at Accessories Unlimited. (AR 51.) He left Accessories Unlimited after about a year "because [he] couldn't keep it together." (AR 52.)

Around 2007, Mr. Lucero "ran into some rage in the road," as a result of which he was incarcerated for several months. (AR 53.) He rear-ended another vehicle, "the car took off again[,] and [Mr. Lucero] took after [the vehicle]," almost catching up. (AR 70.) He also "pulled a rifle out, but it didn't go off." (*Id.*) Thereafter, Mr. Lucero started Lucero Custom Truck, but he "had a

---

[4] Mr. Lucero does not challenge any aspect of the ALJ's decision regarding his physical impairments; therefore, the Court focuses its discussion on Mr. Lucero's mental impairments.

clashing" with his ex-wife and "found [him]self in some rage and [he] ended up in jail, so [he] closed that business down again." (AR 45, 52.)

When Mr. Lucero feels anger, he is not able to stop it. (AR 70.) He feels he cannot work because his mania or anger might cause him to physically hurt someone. (AR 55-56.) He had verbal and physical altercations with his co-workers and bosses at Trucks Unique. (AR 56.) There is "no division" between his concern that he might hurt others and his concern that he might hurt or kill himself. (AR 71.)

Up to seven times a month, Mr. Lucero feels so physically and emotionally drained that he does not have "the motivation to get up and start the day[.]" (AR 58.) His mania causes him to have trouble sleeping "pretty much every night[,]" and his medication affects his mind and body and thus his ability to work. (AR 58-59.) Although he does not have problems with his memory, his ability to concentrate is limited. (AR 61.) When he reads a book, he reads one page for two minutes and then puts the book away until the next day. (AR 62.) He does not have problems understanding or following instructions or making decisions, and he does household chores. (AR 62, 66.) However, he avoids groups of five or six people; it is "rough" even with one or two people; and, the more people there are the rougher it is. (AR 62-63.)

3.     UNM Psychiatric Center 2006-2008[5]

Mr. Lucero's mental health treatment history dates back to at least November 2006, when he received a week of inpatient care at the University of New Mexico ("UNM") Psychiatric Center,

---

[5] The record in this matter includes evidence outside the relevant time period. The Court briefly summarizes such evidence but does not rely on it in granting Mr. Lucero's Motion. *Cf. Overstreet v. Astrue*, No. 10-CV-656-TLW, 2012 WL 996608, at *9 (N.D. Okla. Mar. 23, 2012) ("Evidence outside the relevant time period may be considered to the extent that it assists the ALJ in determining disability during the relevant time period. Such evidence, however, is not dispositive because a finding of disability based solely upon evidence outside the relevant time period would be contrary to the Social Security Act which requires proof of disability during the time for which it is claimed." (citation, quotation marks, and ellipses omitted)) (citing *Hamlin*, 365 F.3d at 1215).

because he reportedly "had not been behaving like his normal self, with increased verbal aggressiveness[ and] threatening behavior towards others, including his ex-wife and parents." (AR 435.) Upon discharge, he was diagnosed with "[m]ajor depressive disorder, recurrent, currently in full remission" and "[a]ntisocial personality disorder with narcissistic traits," and prescribed Prozac. (AR 435, 437.)

Mr. Lucero also received four days of inpatient care at the UNM Psychiatric Center in April 2007 for suicidal ideation with a plan. (AR 416, 421.) He said he had tried to hang himself the week before and that he "had his gun available and was in the process of buying ammunition when he was discovered" by a family member. (AR 416.) He was discharged with a diagnosis of "major depressive disorder, recurrent, severe" and was prescribed mirtazapine. (AR 421.)

Mr. Lucero also received outpatient treatment at the UNM Psychiatric Center in July 2008 to continue on lithium. (AR 408, 410.) At this time, psychiatrists diagnosed Mr. Lucero with "[m]ood disorder, not otherwise specified[,]" "[r]ule out bipolar II disorder[,]" and "[m]arijuana abuse in full-sustained remission[.]" (AR 409.)

4.  <u>Metropolitan Detention Center 2008</u>

Mr. Lucero was incarcerated at the Bernalillo County Metropolitan Detention Center ("MDC") from January to May 2008. (AR 322, 410, 52.) Records generated during this incarceration document that Mr. Lucero persistently engaged in aggressive and abnormal behavior, including yelling, walking into other inmates' cells naked, banging on his cell window, attempting to throw milk at another inmate, masturbating in front of others, trying to strike a corrections officer with a broom handle, kicking his cell door, and making homicidal threats toward corrections staff. (AR 322, 363, 365, 374, 383, 399.) In a psychiatric progress note from April 2008, a provider assessed that Mr. Lucero had bipolar I disorder. (AR 354.) Three notes indicate

that he was at risk of harming himself, (AR 362, 368, 398), and he was placed on suicide watch several times. (AR 335, 341-42, 337, 391.) While at MDC, he was prescribed Ativan, Klonopin, Risperdal, Cogentin, and lithium carbonate, among other medications. (*See*, *e.g.*, AR 323, 327, 336, 340, 349, 354, 361, 380.)

     5.    <u>Kaseman Hospital 2015</u>

On February 5, 2015, Mr. Lucero's daughter brought him to the emergency room at Presbyterian Kaseman Hospital ("Kaseman Hospital") because he

> had not been sleeping more than 4 hours a night in the 2 weeks prior to emergency room evaluation, had become increasingly delusional, and reportedly struck his mother the evening prior to emergency room evaluation, which he denied stating, "I just had to get everyone out of the room so I could pray."

(AR 598.) Mr. Lucero was agitated and threatening and was placed in 4-point restraints and given antipsychotic and anxiolytic medications. (*Id.*) He was then admitted to the hospital's "inpatient psychiatric unit for safety and stabilization." (*Id.*) His mental status exam upon admission indicates that he had "[m]ild short-term memory deficits[,]" although his "[l]ong-term memory appeared to be intact." (*Id.*) "There was also a question of executive dysfunction secondary to ongoing manic and psychotic symptoms." (*Id.*) His speech was "[a]t times pressured, rambling and loud with abnormal prosody." (*Id.*) His thought processes were "[g]oal directed but tangential, loose, irrational, illogical, and ruminative." (*Id.*) His affect was "[s]omewhat angry" and his insight and judgment were "[b]oth deemed poor." (*Id.*)

Mr. Lucero remained at Kaseman Hospital for fourteen days. (*Id.*) He was initially held involuntarily because of his "ongoing manic and psychotic symptoms, as well as concern of his remaining at risk [for] potential harm to others, in particular family members[.]" (AR 599.) "As the days passed and as [Mr. Lucero] was maintained on . . . psychiatric medications, he very slowly improved, although overall he continued to be rather rambling, tangential, ruminative[,] internally

preoccupied[,] and at times confrontational." (*Id.*) He was discharged to his father's care on February 18, 2015. (AR 600.) At discharge, he was diagnosed with "[b]ipolar affective disorder type 1, most recent episode manic with psychotic features" and cannabis abuse, and was noted to be "at risk of breakthrough manic and/or psychotic symptoms." (*Id.*) He was prescribed cetirizine, lithium, lorazepam, olanzapine, and temazepam and directed to obtain follow-up psychiatric care. (AR 603.)

6. <u>Kaseman Hospital 2016</u>

On February 14, 2016, Mr. Lucero again presented at Kaseman Hospital for psychiatric care. (AR 556.) His family told providers that he had "been off lithium for six days so they called EMS." (*Id.*) An EMT gave him a urine cup but noted that "after using the restroom he gave [the EMT] an empty cup." (*Id.*) A nurse tried to give Mr. Lucero oral medications, but he

> had all his [clothes] off and began to yell at RN stat[ing] "you don't tell me what to do and I am not taking shit." Patient got up off the bed and began to come towards RN and postured her. RN left patient room and security was called. Security arrived with assistance from ER staff patient was given injection with assistance. Patient still continued to throw objects out of his room and was not following directions.

(AR 558.) Mr. Lucero was placed in wrist restraints, which he kept biting off. (*Id.*) He apparently spent the night at the hospital; a note from 6:53 a.m. on February 15, 2016 indicates he was "awake and dancing up and down the hall," refused to return to his room, and continued "to have rapid speech and incoherent sentences." (AR 559.) However, Mr. Lucero was "alert and cooperative" during a provider interview, (AR 561), and later that afternoon, he was found to be "stable" and was discharged. (AR 560, 566.) He was prescribed lithium carbonate. (AR 562-63.)

Mr. Lucero returned to Kaseman Hospital from April 9 to April 20, 2016, in the "locked inpatient psychiatric unit due to being deemed unsafe for discharge." (AR 547.) Mr. Lucero's daughter and a friend brought him there after a series of concerning behaviors and incidents. For

example, when police conducted a welfare check on him, Mr. Lucero ran his truck into two police cars. (AR 553.) "When police caught up to [Mr. Lucero] and asked him what he was doing [Mr. Lucero] reportedly told the[m] he was 'trying to get away from the lions.'" (*Id.*) His daughter reported that Mr. Lucero "destroyed" his house by painting crosses on the walls, tearing down bathroom walls, breaking windows, and sprinkling cleaning powder and bleach everywhere, stating that he was "remodeling." (AR 553.) She also reported that he "chased a lady down [and] beat her car with a rope" and put clothes and possessions in a trough and set them on fire. (AR 553.) "Prior to admission, he had been hallucinating and endorsing delusional thoughts in which he saw a giant bug that he believed he had killed on the ward in the past." (AR 547.) Due to hospital personnel's determination that "[h]e posed an imminent risk to himself and others[,]" Mr. Lucero "was placed on appropriate suicide and violence precautions." (*Id.*) At admission, a nurse noted that he was

> tangential and grandiose, has diff[iculty] focusing, says he has been in jail last 30 days, says trouble with tribal police "who are out to get me", admits he wrecked his pickup, says he takes his [lithiuim] every day as [prescribed] and smokes "ounce of wacky cigarettes a week[,]" speech pressured, talkative, took shower right after assessment, calls to his people, hyper, disorganized, is redirectable, cont[inue to] moniter, maintain safety[.]

(AR 505 (emphasis omitted).)

Although he was calm and appropriate at times, (AR 513, 524), "[t]hroughout his hospitalization, he remained manic and quietly psychotic. . . . He continued to remain delusional, disorganized, tangential, irrational, illogical, internally preoccupied, intermittently irritable, and ruminative throughout his hospital course." (AR 547.) Hospital records note a number of abnormal or aggressive behaviors, including pulling his mattress off of his bed, banging on a desk, asking for items from the "'commis[s]ary' confusing the unit with jail[,]" asking staff to turn the television down when the television was not on, putting his shirt on inside out and backwards, telling his

mother that hospital staff was trying to poison him, flushing a banana down the toilet, and pacing the hall "stating that someone's head is going to rol[l] and making punching gestures." (AR 506, 520-21, 528-29, 544.) At the end of his stay, he "was not deemed safe for discharge and as such, he was committed to . . . the New Mexico Behavioral Health Institute," where he was transported by ambulance. (AR 548, 800.) Upon discharge, he was prescribed lithium, lorazepam, and olanzapine. (AR 548.)

7.     New Mexico Behavioral Health Institute April 2016

Mr. Lucero's Initial Treatment Plan at the New Mexico Behavioral Health Institute notes "problems" including "[d]anger to others as evidenced by aggressive behaviors towards daughter due to altered mental status (visual [h]allucinations)[,]" "[m]edication [n]oncompliance[,]" "[s]ubstance [a]buse: ETOH and [m]arijuana[,]" and "[p]ain." (AR 746.) Upon admission, he was diagnosed with "[b]ipolar 1" and cannabis use. (*Id.*) It appears that he remained at this facility through at least April 25, 2016, when his lithium levels were tested and found to be low. (AR 754.)

8.     Mesilla Valley Hospital May 2017

Mr. Lucero received treatment at Mesilla Valley Hospital from May 13 to May 19, 2017 for "worsening depression for the past 11 months culminating in contemplation for suicide, which necessitates treatment in the inpatient psychiatric setting." (AR 925-941.) His mental status examination upon evaluation was generally normal except for suicidal thoughts. (AR 931-932.) Aghaegbulam Uga, M.D., diagnosed him with Bipolar I Disorder, most recent episode depression, severe without psychotic symptoms. (AR 933.) At discharge, he was prescribed lithium, Seroquel, Wellbutrin, and Lamictal for his bipolar disorder and depression. (AR 941.)

9.     Bella Vida Healthcare Clinic 2013-2018

From 2013 through 2018, Mr. Lucero received treatment at Bella Vida Healthcare Clinic in Los Lunas, New Mexico, from Nurse Practitioner ("NP") Kathy Fresquez-Chavez, often for management and refills of his lithium prescription. (*e.g.*, AR 444, 446, 449, 452, 460, 463, 603, 671, 905.) Throughout this period, NP Fresquez-Chavez usually diagnosed him with bipolar disorder and prescribed lithium. (AR 445, 453, 456-57, 462, 465-66, 673-75, 673-76, 907.) On June 7, 2016, NP Fresquez-Chavez noted that Mr. Lucero reported he stopped taking his medication and had an incident with the police during which the police blew out the tires on his truck and he was "sent to Las Vegas[,] New Mexico."[6] (AR 463.) She also noted that Mr. Lucero's "mood is depressed and the affect anxious, patient teary when talking about his family and the situation that was caused." (AR 465.) NP Fresquez-Chavez continued to report that Mr. Lucero's mood was depressed and his affect anxious as late as February 4, 2018. (AR 470, 473, 479, 483, 489, 673, 678, 683, 689, 695, 700, 711, 729, 907.) At various points during this time, in addition to lithium, Mr. Lucero was prescribed trazodone, tramadol, Wellbutrin, Ambien, and lamotrigine, among other medications. (AR 456, 481, 487, 693, 905.)

10.     Integrated Healthcare of New Mexico 2016-2018

Stephen Cheshire, Ph.D., of Integrated Healthcare of New Mexico saw Mr. Lucero for a series of psychotherapy visits from November 2016 to January 2018. (AR 811-80.) In notes from these visits, Dr. Cheshire repeatedly diagnosed Mr. Lucero with bipolar disorder. (AR 813, 816, 820, 823, 826, 829, 835, 839, 843, 847, 851, 855, 859, 867, 870, 873, 877.) Starting in February 2017, Dr. Cheshire also diagnosed Mr. Lucero with post-traumatic stress disorder. (AR 826, 829, 835, 839, 843, 847, 851, 855, 859, 867, 870, 873, 875, 877, 879.)

---

[6] The New Mexico Behavioral Health Institute, where Kaseman Hospital sent Mr. Lucero in April 2016, is located in Las Vegas, New Mexico. (AR 746.)

In early sessions, Dr. Cheshire noted that Mr. Lucero's "thought content is characterized by racing thoughts." (AR 811, 816, 820, 823.) Starting in February 2017, Dr. Cheshire noted that Mr. Lucero's thought content was instead "characterized by preoccupation with current symptomology." (AR 826, 829, 835) Then, starting in May 2017, he described it as "characterized by morbid thinking." (AR 839, 843.) Finally, in June 2017, Dr. Cheshire began to write that Mr. Lucero's "thought content is characterized by no significant preoccupations." (AR 847, 851, 855, 859, 867, 870, 873, 877.)

At first, Dr. Cheshire noted that Mr. Lucero's "[a]ttention/[c]oncentration" was "characterized by distractibility." (AR 811, 816, 820.) Starting in January 2017, Dr. Cheshire began to note that Mr. Lucero's "[a]ttention/[c]oncentration is characterized by ability to attend and maintain focus." (AR 823, 826, 829, 835, 839, 843, 847, 851, 855, 859, 867, 877.)

From November 2016 to April 2017, Dr. Cheshire assessed a "mild" risk of suicide because Mr. Lucero's "[e]motional dysregulation is quite pronounced[.]" (AR 814, 817, 821, 824, 826.) In February 2017, Dr. Cheshire also began to note that Mr. Lucero reported suicidal ideation but denied any current plan or intent. (AR 827, 830, 837, 840.) In May 2017, Dr. Cheshire raised his assessment of Mr. Lucero's suicide risk to "moderate[,]" continuing to note that Mr. Lucero's "[e]motional dysregulation is quite pronounced and he reports suicidal ideation but denies any current plan or intent." (AR 840, 844-45.) In June 2017, Dr. Cheshire lowered his assessment of Mr. Lucero's suicide risk to "[m]ild," (AR 848), and then, from July 2017, assessed that the risk was "not evident." (AR 842, 852, 856, 860, 868, 871, 875)

In notes from November 2016 to May 2017, Dr. Cheshire noted a "moderate" risk of physical violence due to Mr. Lucero's "[r]ecent history of severe aggressive outbursts when manic." (AR 814, 817, 821-22, 824, 827, 831, 837, 840, 845.) Starting in June 2017, Dr. Cheshire

lowered this risk assessment to "mild[,]" noting that Mr. Lucero's history of outbursts had become "[r]emote[.]" (AR 848, 852.) Starting in July 2017, Dr. Cheshire assessed this risk as "[n]ot [e]vident[.]" (AR 856, 860, 868, 871, 875, 879.)

On December 1, 2016, Dr. Cheshire saw Mr. Lucero for an "emergent appointment" due to "considerable agitation as well as suicidal ideation though he denies any current plan or intent." (AR 817.) At this appointment, Dr. Cheshire noted that Mr. Lucero was "clearly agitated and has difficulty remaining seated throughout the therapy session." (*Id.*) Although Dr. Cheshire noted improvement over the course of his sessions with Mr. Lucero, at his last session on January 18, 2018, Dr. Cheshire reported that Mr. Lucero was still

> experiencing anxiety and worry, brooding over the past, depressed mood, difficulties with sleep maintenance, diminished ability to feel pleasure, diminished energy, diminished interest in being with other people, diminished interest in usual activities, diminished need for sleep, dysphoric mood, excessive distractibility, initial insomnia, intermixed manic and depressive episodes, irritable mood, problems with sexual functioning, psychomotor agitation and social withdrawal.

(AR 877-78.) Over the course of his treatment of Mr. Lucero, Dr. Cheshire prescribed numerous medications including olanzapine, lithium carbonate, zolpidem, trazodone, Lamictal, Seroquel, Risperdal, Saphris, buspirone, Latuda, Depakote, benztropine, and Tegretol. (AR 813-14, 818, 822, 828, 831, 837, 841, 849.)

NP Claudia Cruz, another provider at Integrated Healthcare of New Mexico, saw Mr. Lucero three times for "outpatient medication management [and] psychotherapy" from September to December 2018. (AR 911-922.) She diagnosed Mr. Lucero with "[p]ost-traumatic stress disorder (PTSD), chronic" and "[b]ipolar disorder, current episode depressed, mild[.]" (AR 911, 915, 919.) *Inter alia*, she reported that his "[a]ttitude can be described as cooperative and interested" and his "[a]ttention/[c]oncentration is characterized by an ability to attend and maintain

focus." (AR 911, 915, 919.) She did not report any risk of suicide or physical violence. (AR 913, 917, 921.) She prescribed Seroquel, lithium carbonate, Lamictal, and Tegretol. (AR 912, 916, 920.)

11.    Function Reports

Mr. Lucero completed adult function reports in December 2016 and August 2017. (AR 265, Doc. 15-2 at 2.) In December 2016, Mr. Lucero reported the following. His conditions prevent him from working from 8:00 a.m. to 5:00 p.m. and cause a loss of sleep. (AR 266.) A lack of motivation affects his cooking habits. (AR 267.) Although he spends time outside and shops, he engages in hobbies less often due to his conditions. (AR 268-69.) He spends time with a friend 3-4 times a week and goes to the park and church once a week. (AR 269.) His conditions affect his ability to complete tasks and concentrate, and it "takes [a] lot more motivation to do these things." (AR 270.) However, he is able to pay attention, follow written and spoken instructions, get along with authority figures, and handle changes in routine "most [of] the time." (AR 270-71.) He reported that he has not been fired or laid off from a job because of problems getting along with other people, and that he handles stress "somewhat" well. (AR 271.)

In August 2017, in turn, Mr. Lucero reported as follows. He only sleeps 2-3 hours per night. (AR 274.) He does laundry, cleans the house, and does other household chores. (AR 275.) His conditions affect his abilities to stand, remember, complete tasks, and concentrate, and have caused a "loss of goals[] and intention in life[.]" (AR 278.) He reported that he *has* been "fired or laid off from a job because of problems getting along with other people." (AR 279.) He is on several medications, including lithium. (*Id.*) He remarked that it has been "very hard being bipolar since 2009 [and the] highs and lows are hard to control." (AR 280.)

Mr. Lucero's mother completed a third-party adult function report on August 29, 2017, reporting as follows. (AR 281.) Before his illness, Mr. Lucero was able to do more, and his sleep

is affected in that he "was only able to sleep two hours a night[.]" (AR 282.) Regarding house and yard work, although Mr. Lucero does not need help or encouragement, he has a "lot less motivation to do these things[.]" (AR 283-84.) Socially, he is "a lot less active[.]" (AR 286.) His conditions affect his abilities to remember and complete tasks because he has "a lot[] less enthusiasm to do things." (*Id.*) Although he gets along with authority figures "pretty good for [the] most part[,]" he was fired or laid off from a job because he "got angry with [coworkers]." (AR 287.) He has seen things that were not there. (*Id.*) She remarked that Mr. Lucero "has suffered with bipolar disorder since 2009 and has had [difficulties] with medication[,] very hard to get him stable." (AR 288.)

  12. <u>Dr. Logan</u>

  Dr. Logan prepared the Mental Residual Functional Capacity Assessment ("MRFCA") portions of the Disability Determination Explanations for Mr. Lucero's DIB and SSI claims on June 16, 2017. (AR 89-91, 103-06.) In his two identical assessments, Dr. Logan opined that Mr. Lucero is "moderately limited" in the following "sustained concentration and persistence" abilities: (1) "[t]he ability to carry out detailed instructions"; (2) "[t]he ability to maintain attention and concentration for extended periods"; (3) "[t]he ability to work in coordination with or in proximity to others without being distracted by them"; and (4) "[t]he ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (AR 89-90, 104.)

  Dr. Logan also opined that Mr. Lucero has the following moderate "social interaction limitations": (1) "[t]he ability to interact appropriately with the general public"; (2) "[t]he ability to accept instructions and respond appropriately to criticism from supervisors"; and, (3) "[t]he ability to get along with coworkers or peers without distracting them or exhibiting behavioral

extremes." (AR 90, 104-05.) Under "MRFC - Additional Explanation[,]" Dr. Logan added that

Mr. Lucero "is limited to performing simple repetitive work[-]related tasks in a setting where

interactions with others are brief and task focused." (AR 91, 105.)

**B.**    **The ALJ erred by failing to adequately explain the weight he assigned to Dr. Logan's opinions and why he effectively rejected some of them.**

     1.    <u>Applicable Law</u>

"An ALJ must evaluate every medical opinion in the record, although the weight given

each opinion will vary according to the relationship between the disability claimant and the

medical professional." *Hamlin*, 365 F.3d at 1215 (citation omitted). In doing so, ALJs must

consider the examining relationship, treatment relationship, length of treatment relationship and

frequency of examination, nature and extent of treatment relationship, supportability and

consistency of the opinion, specialization of the provider, and other factors. 20 C.F.R. §§

404.1527(c), 416.927(c).[7] "Although ALJs need not discuss every piece of evidence, they are

required to discuss the weight assigned to each medical source opinion." *Silva v. Colvin*, 203 F.

Supp. 3d 1153, 1157 (D.N.M. 2016); *see also Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th

Cir. 2012) (stating that an ALJ must "give consideration" and "discuss the weight he assigns" to

"all the medical opinions in the record"). In particular, "when assessing a plaintiff's RFC, an ALJ

must explain what weight is assigned to each opinion and why." *Silva*, 203 F. Supp. 3d at 1157;

*see also* SSR 96-5p[8], 1996 WL 374183, at *5 (July 2, 1996) ("Adjudicators must weigh medical

source statements under the rules set out in 20 CFR 404.1527 and 416.927, providing appropriate

---

[7] The SSA has issued new regulations regarding the evaluation of medical source opinions for claims filed on or after March 27, 2017. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); 20 C.F.R. §§ 416.927, 416.920c. Because Mr. Lucero filed his claims in 2016, the previous regulations still apply to this matter. *See Id.*; (AR 20, 108, 109.)

[8] SSR 96-5p was rescinded for claims filed on or after March 27, 2017. 82 Fed. Reg. 15263 (Mar. 27, 2017). Because Mr. Lucero filed his claims in 2016, SSR 96-5p still applies to this matter. *Bailey v. Berryhill*, No. 18-CV-0011 SMV, 2018 WL 6046244, at *3 n.4 (D.N.M. Nov. 19, 2018).

explanations for accepting or rejecting such opinions."). An ALJ's failure to adequately explain how he or she weighed a medical opinion constitutes reversible error. *See Reyes v. Bowen*, 845 F.2d 242, 244 (10th Cir. 1988) ("There are specific rules of law that must be followed in weighing particular types of evidence in disability cases. Failure to follow these rules constitutes reversible error." (citation omitted)).

Where a medical source assesses a "moderate limitation" on a claimant's ability to perform an activity, such assessment indicates that the claimant's ability is impaired. *See* Social Security Administration, Program Operations Manual System ("POMS"), DI 24510.063(B)(2) (Completion of Section I of SSA-4734-F4-SUP) (1994) (providing that the box for "moderately limited" on a MRFCA form should be checked "when the evidence supports the conclusion that the individual's capacity to perform the activity is impaired" (emphasis omitted)); *Bowers v. Astrue*, 271 F. App'x 731, 733 (10th Cir. 2008) (unpublished) (noting that claimant's "eight moderate impairments" may have "decreased her ability to perform [simple] work"); *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) ("[A] moderate impairment is not the same as no impairment at all."). Where the ALJ finds "severe impairments"—*i.e.*, impairments that "significantly limit[ the claimant's] physical or mental ability to do basic work activities," 20 C.F.R. §§ 404.1520(c), 416.920(c)—at step two of the sequential analysis, the significant limitations such impairments cause should not be ignored when the ALJ determines the claimant's RFC at step four. *See Givens v. Astrue*, 251 F. App'x 561, 566 (10th Cir. 2007) (unpublished)[9] ("Of primary concern, the ALJ concluded at step two of the analysis that Ms. Givens' depression constituted a severe impairment. That impairment had disappeared from his analysis, however, by

---

[9] In the Tenth Circuit, unpublished decisions are not binding precedent but may be cited for their persuasive value. *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

the time he reached step five. This adjudicative sleight-of-hand was not achieved in conformity with either the applicable regulations or the evidence.").

The ALJ may account for moderate limitations that a medical source assesses "by limiting the claimant to particular kinds of work activity" in his or her RFC determination. *Smith v. Colvin*, 821 F.3d 1264, 1269 (10th Cir. 2016). When the ALJ does not do so, but instead assesses an RFC that contradicts a medical source opinion, the ALJ must explain why the medical source opinion was not entitled to greater weight. *See* SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996) ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence. . . . If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."); *see also Givens*, 251 F. App'x at 568 ("If the ALJ rejects any significantly probative medical evidence concerning [a claimant's] RFC, he must provide adequate reasons for his decision to reject that evidence."). Where the ALJ does not adequately explain his or her rejection of a medical source opinion, the case must be remanded for the ALJ to do so. *Haga*, 482 F.3d at 1208-09; *Frantz v. Astrue*, 509 F.3d 1299, 1302-03 (10th Cir. 2007); *Givens*, 251 F. App'x at 568.

In *Haga*, 482 F.3d at 1207, a consulting mental health professional completed a mental RFC form "on which he marked [the claimant] moderately impaired in seven out of ten functional categories." The ALJ "rejected four of the moderate restrictions . . . while appearing to adopt the others." *Id.* at 1208. Because the ALJ did not explain why he did so, the court remanded "so that the ALJ can explain the evidentiary support for his RFC determination." *Id.* at 1208-09. The Court noted that the consultant's opinion was uncontradicted and that "the evidence on which the ALJ explicitly relied in his decision does not imply an explanation for rejecting any of [the consultant's]

restrictions on the mental RFC form, and, in fact, the ALJ never stated that he rejected [the consultant's] opinion." *Id.* at 1208. Thus, because it was "simply unexplained why the ALJ adopted some of [the consultant's] restrictions but not others[,]" remand was appropriate.[10] *Id.* at 1208-09; *see also Frantz*, 509 F.3d at 1302-03 ("[T]he ALJ erred in accepting some of the moderate limitations in the Mental RFC form . . . but rejecting others without discussion.").

> In determining a claimant's RFC, the ALJ
>
> > must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., *8 hours a day, for 5 days a week,* or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996) (emphasis added) (footnote omitted). The "[m]ental [a]bilities [n]eeded [f]or [a]ny [j]ob" include "[t]he ability to maintain concentration and attention for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure)." POMS DI 25020.010(B)(2)(a) (Mental Limitations) (2007). Similarly, the abilities to interact appropriately with supervisors and coworkers are work-related mental abilities "critical to all work, and the ALJ must adequately address [them] in the RFC." *Bennett v. Berryhill*, No. 1:16-CV-00399-LF, 2017 WL 5612154, at *7 (D.N.M. Nov. 21, 2017); POMS DI 25020.010(B)(2)(c).

2.    Application

---

[10] ALJs are not required to adopt or reject a medical source's opinions wholesale; medical sources often provide opinions on several different issues. *Cf.* SSR 96-2P, 1996 WL 374188, at *2 (July 2, 1996) ("It is not unusual for a single treating source to provide medical opinions about several issues; for example, at least one diagnosis, a prognosis, and an opinion about what the individual can still do."), *rescinded for claims filed on or after March 27, 2017 by* 82 Fed. Reg. 15263 (Mar. 27, 2017). However, an ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence." *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004).

As an initial matter, the ALJ failed to adequately explain the weight he assigned to Dr. Logan's opinions in general. The ALJ stated that he gave these opinions "partial weight, to the extent consistent with the record as a whole." (AR 27.) However, he did not identify any way in which the opinions were inconsistent with the record as a whole. (*Id.*) To the contrary, the ALJ said Dr. Logan's opinions were "relatively consistent with the claimant's allegations regarding difficulty focusing and isolative behavior, but account[] for the objective evidence of record, which shows consistently intact memory, attention[] and concentration, and cooperative behavior." (AR 26-27.) Therefore, even assuming the ALJ actually applied the factors to be considered in weighing medical opinions set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c), he failed entirely to explain such application, contrary to SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996). The ALJ's bare reference to "the record as a whole" is simply too vague for the Court to meaningfully review, and his failure to adequately explain the weight he assigned Dr. Logan's opinion constitutes reversible error. *See Reyes*, 845 F.2d at 244-45.

In addition to his failure to explain the weight he assigned to Dr. Logan's opinions in general, the ALJ also failed to explain in particular why he did not account for specific limitations Dr. Logan assessed in his RFC determination. The Court examines these limitations according to their categories in Dr. Logan's assessment: (1) sustained concentration and persistence limitations; and, (2) social interaction limitations. (AR 89-90, 104.) As discussed below, the ALJ's failure to explain his effective rejection of these limitations also constitutes reversible error.

First, the ALJ effectively rejected Dr. Logan's opinion that Mr. Lucero's ability to "maintain attention and concentration for *extended periods*" is moderately impaired. (AR 90, 104 (emphasis added).) "[E]xtended periods" refers to "the approximately *2-hour segments* between arrival and first break, lunch, second break, and departure." POMS DI 25020.010(b)(2)(a)

(emphasis added). The ALJ concluded that Mr. Lucero can maintain concentration, persistence, and pace for two-hour intervals. (AR 24.) Thus, the ALJ essentially determined that Mr. Lucero can maintain attention and concentration for "extended periods," directly contrary to Dr. Logan's opinion on this point. In addition, the ALJ's RFC determination wholly fails to account for Dr. Logan's opinion that Mr. Lucero is moderately impaired in his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."[11] (AR 90, 104); *see* POMS DI 24510.063(B)(2); *Bowers*, 271 F. App'x at 733; *Haga*, 482 F.3d at 1208.

Not only did the ALJ fail to expressly explain his rejection of Dr. Logan's opinions regarding concentration, persistence, and pace in his decision, but also his decision fails to imply such an explanation. Consistent with Dr. Logan's opinions, the ALJ found at step three that Mr. Lucero has a "moderate limitation" in his ability to concentrate, persist, or maintain pace. (AR 23.) The ALJ noted that Mr. Lucero "reported difficulty concentrating and completing tasks, alleging an attention span of only ten to fifteen minutes." (*Id.*, *citing* AR 278.) However, citing Dr. Cheshire's and NP Cruz's notes, the ALJ added that "[t]he claimant's attention and concentration capability was generally characterized by his ability to attend and maintain focus during treatment sessions, despite his mental impairments, and so the undersigned cannot find more than a moderate limitation concentrating, persisting, or maintaining pace." (*Id., citing* AR 820, 823, 826, 829, 835,

---

[11] The Commissioner suggests that the ALJ accounted for these limitations by restricting Mr. Lucero to simple, routine, repetitive tasks requiring only simple work-related decisions and involving only occasional contact with others. (Doc. 24 at 6.) However, the restrictions on which the Commissioner relies do not account for limited abilities to "maintain attention and concentration for extended periods" and "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (AR 90, 104.) Rather, these restrictions are plainly addressed to other limitations Dr. Logan assessed, *i.e.*, Mr. Lucero's limited abilities to carry out detailed instructions, respond appropriately to changes in the work setting, set realistic goals or make plans independently of others, and interact more than occasionally with others. (AR 89-91, 105.)

839, 843, 847, 851, 877, 882, 886, 911, 915, 919.) In short, the ALJ's step-three reasoning does not imply a reason for rejecting Dr. Logan's opinions.

Nor does the ALJ's step-four reasoning imply such an explanation. At this step, the ALJ again cited to Dr. Cheshire's and NP Cruz's notes indicating that Mr. Lucero's attention or concentration was "generally characterized by ability to attend and maintain focus" during periodic thirty to sixty-minute psychotherapy sessions. (AR 26, *citing* AR 820, 823, 826, 829, 835, 839, 843, 847, 851, 877, 882, 886, 911, 915, 919.) However, these notes do not contradict Dr. Logan's opinions that Mr. Lucero is moderately impaired in his abilities to "maintain attention and concentration for extended periods" and "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (AR 90, 104.) The ability to maintain attention and concentration during periodic psychotherapy sessions of an hour or less is not the same as the ability to maintain attention and concentration in a work setting for two-hour periods for an entire workday and workweek. Thus, the ALJ's citation to these notes "does not imply an explanation for rejecting any of [Dr. Logan's] restrictions on the mental RFC form, and, in fact, the ALJ never stated that he rejected Dr. [Logan's] opinion."[12] *Haga*, 482 F.3d at 1208.

Nor is the ALJ's rejection explained by his giving "some weight" to Mr. Lucero's mother's report that Mr. Lucero "has difficulty with memory and completing tasks, but generally pays

---

[12] The ALJ did later refer to "objective evidence of record, which shows *consistently* intact . . . attention[] and concentration," but he did not cite the record to support this reference. (AR 26-27 (emphasis added).) Moreover, not only is the reference inconsistent with the ALJ's own earlier, more precise observation that Mr. Lucero was *generally* able to pay attention and focus *during therapy sessions*, (AR 26), but also, considerable record evidence undercuts it. For example, a provider at Kaseman Hospital in February 2015 noted that "[i]t was difficult to take history from [Mr. Lucero] because it is difficult to keep him focused on answering the questions[.]" (AR 570.) Similarly, a provider at Kaseman Hospital in April 2016 noted that Mr. Lucero had "diff[iculty] focusing." (AR 757.) In three notes in November and December 2016, Dr. Chesire indicated that Mr. Lucero's "[a]ttention/[c]oncentration is characterized by distractibility." (AR 811, 816, 820.) And, at his last psychotherapy session with Mr. Lucero in January 2018, Dr. Cheshire noted that Mr. Lucero was still experiencing "excessive distractibility[.]" (AR 877.)

attention, finishes what he starts, and follows written and spoken instructions 'okay.'" (AR 27; *see* AR 286.) This report, which the ALJ acknowledged was "relatively nonspecific," does not contradict Dr. Logan's assessment that Mr. Lucero is moderately limited in his ability to sustain concentration, persistence, and pace in a work setting. (AR 27.) By August 2017, when Ms. Lucero completed her third-party adult function report, Mr. Lucero had been unemployed for at least seven years. (AR 45, 226, 281.) In these circumstances, the ability to "generally" pay attention and finish what one starts does not necessarily imply an unimpaired ability to maintain concentration, persistence, and pace at work, particularly where one "has difficulty with memory and completing tasks." (AR 27.) Thus, the ALJ's citation to Mr. Lucero's mother's report does not imply an adequate explanation for his effective rejection of Dr. Logan's opinions. *Cf. Haga*, 482 F.3d at 1208.

The Commissioner suggests that the ALJ was not required to explain his rejection of Dr. Logan's opinions because "Dr. [Logan] opted not to include any limitations in maintaining concentration, persistence, or pace" when he "describe[d] Plaintiff's mental RFC limitations in narrative form[.]" (Doc. 24 at 5-6.) This appears to be an argument that the ALJ did not need to account for Dr. Logan's opinions regarding concentration, persistence, and pace because Dr. Logan opined to these limitations in "Section I" of the MRFCA form, rather than "Section III," *i.e.*, the "narrative" portion of the form.[13] However,

> the POMS distinguishes between Section I and Section III expressly in order to assist the doctor (who is acting as an adjudicator) in making an ultimate determination of disability, rather than to dictate (or even suggest) how the ALJ

---

[13] Dr. Logan's MRFCA form "does not actually contain a Section I or Section III." *Silva*, 203 F. Supp. 3d at 1164 n .5; (*see* AR 89-91, AR 104-06.) It appears that "the traditional form no longer exists as a stand-alone form," but rather has been incorporated into the agency's electronic claims system. *Silva*, 203 F. Supp. 3d at 1164 n.5 (quotation marks omitted). "[T]he Court can infer which portions would constitute the Section I and Section III findings in the traditional form. However, it would be difficult to agree with the Commissioner that in this case, the ALJ was permitted to ignore the Section I findings when they are not identified as such." *Id.*

> should weigh the doctor's MRFCA form (i.e., his nonexamining opinion) at a later administrative stage. The regulations, the POMS, and the case law explicitly and repeatedly require ALJs to consider *all* of the findings made by nonexamining physicians and do not except the Section I findings.

*Silva*, 203 F. Supp. 3d at 1164 (emphasis in original). Thus, the Court cannot agree with the Commissioner that the ALJ was permitted to ignore Dr. Logan's "Section I" findings merely because they were not recorded in narrative form.

Finally, the Court notes that in his RFC determination, the ALJ failed to account not only for Dr. Logan's opinions regarding concentration, persistence, and pace, but also for his own step-three finding on this point. (*Compare* AR 23 *with* AR 24-29.) Similar to the ALJ in *Givens*, the ALJ in this case assessed moderate limitations due to severe mental impairments at steps two and three that disappeared from his analysis at steps four and five. *See Givens*, 251 F. App'x at 566. And, as in *Givens*, "[t]his adjudicative sleight-of-hand was not achieved in conformity with either the applicable regulations or the evidence." *See id.*; (*compare* AR 23 *with* AR 24-29.) In sum, the ALJ's failure to explain his effective rejection of Dr. Logan's opinions regarding concentration, persistence, and pace leaves this Court without "sufficient basis to determine that appropriate legal principles have been followed[,]" *Jensen*, 436 F.3d at 1165, and requires remand "so that the ALJ can explain the evidentiary support for his RFC determination[,]" *Haga*, 482 F.3d at 1208-09. *See Frantz*, 509 F.3d at 1302-03 (remanding to allow the ALJ to explain why he accepted some moderate limitations that a nonexamining physician assessed but rejected others).

The ALJ also failed in his RFC determination to account for a limitation Dr. Logan assessed on Mr. Lucero's ability to interact with others. As previously noted, Dr. Logan opined in this regard that Mr. Lucero is limited to work "in a setting where interactions with others are *brief and task focused*." (AR 91, 105 (emphasis added).) This limitation reflects Dr. Logan's assessment that Mr. Lucero is moderately limited in his abilities to interact appropriately with the general public,

accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 90, 105.)

The ALJ failed to account in the RFC for Dr. Logan's "brief and task focused" limitation he assigned to Mr. Lucero. In his RFC determination, the ALJ limited Mr. Lucero to "interacting *occasionally* with supervisors, coworkers, and the general public." (AR 24 (emphasis added).) This amounted to a rejection of Dr. Logan's opinion that Mr. Lucero's work interactions should be limited in length and substance. "Occasional" interactions are interactions that occur "from very little up to one-third of the time," *i.e.*, for up to over two-and-a-half hours per eight-hour workday. SSR 83-10, 1983 WL 31251 (August 20, 1980), at *5. Thus, such interactions are not necessarily "brief." Nor are they necessarily "task-focused," and as this Court has observed in another context, "[l]ess interaction does not necessarily make for appropriate interaction[.]" *Gomez v. Berryhill*, No. CV 17-155 KK, 2018 WL 2973400, at *12 (D.N.M. June 13, 2018).

The ALJ failed to explicitly or implicitly explain his rejection of Dr. Logan's opinion on this point. At step three, the ALJ found that Mr. Lucero has a "moderate limitation" in "interacting with others." (AR 23.) Likewise, at step four, the ALJ acknowledged Mr. Lucero's testimony that he has "significant anger issues, having previously had altercations with coworkers and supervisors, as well as with law enforcement." (AR 25.) He further acknowledged that Mr. Lucero "tends to isolate himself and prefers smaller groups of people." (*Id.*) These findings are consistent with Dr. Logan's opinion that Mr. Lucero is limited to brief and task-focused work interactions and thus do not even imply a reason for rejecting such opinion.

The ALJ did note, at step three, that Mr. Lucero "reported spending time talking with friends and attending church on a weekly basis." (AR 23, *citing* AR 277-78.) The ALJ also wrote that Mr. Lucero "consistently exhibited open, cooperative, and interested attitude [sic] throughout

the relevant period," citing notes from Mr. Lucero's psychotherapy sessions with Dr. Cheshire and NP Cruz. (*Id., citing* AR 820, 823, 826, 829, 835, 839, 843, 847, 851, 877, 882, 886, 911, 915, 919.) Similarly, in discussing his RFC determination, the ALJ reasoned that "[d]uring treatment sessions for bipolar disorder and posttraumatic stress disorder throughout the relevant period, . . . [Mr. Lucero] consistently exhibited . . . [an] open, cooperative, and interested attitude," again citing Dr. Cheshire's and NP Cruz's notes.[14] (AR 26, *citing* AR 820, 823, 826, 829, 835, 839, 843, 847, 851, 877, 882, 886, 911, 915, 919.) The ALJ also cited Dr. Uga's report regarding his psychiatric evaluation of Mr. Lucero at Mesilla Valley Hospital, in which Dr. Uga noted that Mr. Lucero "appeared very calm and cooperative[.]" (AR 26, *citing* AR 931.) However, none of these findings contradict Dr. Logan's opinion that Mr. Lucero's work interactions should be brief and task focused. Personal, religious, and therapeutic interactions are of a different and generally more relaxed, flexible, and forgiving nature than work interactions. Thus, Mr. Lucero's ability to periodically accomplish the former does not necessarily imply an unimpaired ability to successfully engage in the latter up to two-and-a-half hours per day, five days a week. *Cf. Haga*, 482 F.3d at 1208.

Finally, the ALJ's reference to Mr. Lucero's own general statement that he does not have problems getting along with others fails to imply an explanation for rejecting Dr. Logan's opinion. (AR 23, *citing* AR 278.) Mr. Lucero made this statement in an adult function report he completed

---

[14] While Dr. Chesire and NP Cruz noted this to be Mr. Lucero's attitude during psychotherapy sessions, the record shows that Mr. Lucero exhibited a very different attitude at other times throughout the relevant period. For example, in February 2015, he was so agitated and threatening that he was placed in 4-point restraints and given antipsychotic and anxiolytic medications, and in February 2016, he was so hostile and threatening toward a nurse that security had to be called. (AR 558, 598.) Likewise, the evidence that Mr. Lucero ran his truck into two police cars and "chased a lady down [and] beat her car with a rope" indicates Mr. Lucero did not consistently exhibit an open, cooperative, and interested attitude. (AR 553.) Even Dr. Cheshire, while noting that Mr. Lucero was "open, cooperative, and interested" during therapy, many times concluded that he posed a "[m]oderate" risk of "[p]hysical [v]iolence" due to his recent history of "severe aggressive outbursts when manic." (AR 814, 817, 821-22, 824, 827, 831, 837, 840, 845.)

at least seven years after he last worked, (AR 278; Doc. 15-2 at 2) and on the very next page of the report, he noted that he had been fired or laid off from a job because of problems getting along with other people. (AR 279); *cf. Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 743 (10th Cir. 1993) ("The ALJ built his factual basis by taking Plaintiff's testimony out of context and selectively acknowledging parts of her statements while leaving important segments out."). Thus, the ALJ's references to these portions of the record fail to imply an adequate explanation for his rejection of Dr. Logan's opinion limiting Mr. Lucero to brief and task-focused work interactions. In sum, the ALJ's general failure to adequately explain the weight he assigned to Dr. Logan's opinions is reversible error, as is his failure to explain—either directly or by implication— why he did not account in his RFC determination for the specific moderate limitations Dr. Logan assessed. *See* SSR 96-8p, 1996 WL 374184 (July 2, 1996), at *7; *Frantz*, 509 F.3d at 1302-03; *Haga*, 482 F.3d at 1208-09.

**C.     The ALJ's error was not harmless.**

The Tenth Circuit "appl[ies] harmless error analysis cautiously in the administrative review setting." *Fischer-Ross*, 431 F.3d at 733. Nevertheless, "harmless error analysis . . . may be appropriate to supply a missing dispositive finding" where a court can "confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *Id.* at 733-34. *Inter alia*, the failure to provide adequate reasons for the weight assigned to a medical opinion "involves harmless error if there is no inconsistency between the opinion and the ALJ's assessment of residual functional capacity." *Mays v. Colvin*, 739 F.3d 569, 578-79 (10th Cir. 2014). In that situation, the claimant is not prejudiced "because giving greater weight to the opinion would not have helped her." *Id.* at 579 (brackets omitted).

Here, Dr. Logan's opinions regarding Mr. Lucero's abilities to maintain concentration, persistence, and pace and interact appropriately with others on the one hand, and the ALJ's RFC determination on the other, are inconsistent. As discussed above, Dr. Logan opined that Mr. Lucero's abilities to maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes are all moderately limited. (AR 90, 104-05.) Dr. Logan also opined that Mr. Lucero is limited to working "in a setting where interactions with others are brief and task focused." (AR 91, 105.)

In contrast, the ALJ found that Mr. Lucero is only limited to performing "simple, routine, repetitive tasks, making simple work[-]related decisions, maintaining concentration, persistence and pace *for two-hour intervals*, and interacting *occasionally* with supervisors, coworkers, and the general public." (AR 24 (emphases added).) Thus, as explained in greater detail above, Dr. Logan opined that Mr. Lucero is more impaired than the ALJ's RFC accommodates. Had the ALJ given greater weight to Dr. Logan's opinions regarding Mr. Lucero's impairments, he would likely have assigned Mr. Lucero a more restrictive RFC with respect to Mr. Lucero's abilities to maintain concentration, persistence, and pace and to interact appropriately with others. Moreover, abundant record evidence supports at least the limitations Dr. Logan assessed, such that the Court cannot "confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *See Fischer-Ross*, 431 F.3d at 733-34.

A more restrictive RFC with respect to concentration, persistence, pace, and interactions with others may have resulted in a finding of disability. The VE testified that a hypothetical employee would be unable to perform "any past work or other work" if the individual would arrive late, leave early, or miss work altogether more than two days a month, or if the individual would be "off task more than 15 percent of the workday for any reason[.]" (AR 75-76.) This suggests that a more restrictive RFC with respect to concentration, persistence, and pace may have resulted in a finding of disability. Likewise, the abilities to respond appropriately to supervision and coworkers are among the mental abilities needed for any job; thus, an RFC providing for greater restrictions on these abilities also may have resulted in a finding of disability. *See* POMS DI 25020.010(B)(2)(c); *see also Bennett*, 2017 WL 5612154, at *7. Therefore, the ALJ's failure to provide adequate reasons for his treatment of Dr. Logan's opinions was not harmless.

**D. Remaining Issues**

The Court will not address Mr. Lucero's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand. *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

**IV. <u>Conclusion</u>**

For the reasons stated above, Mr. Lucero's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 22) is GRANTED.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent